## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal No. 1:19-cr-000026 (CKK)** |
| | : | |
| **BILAL AHMED, DDS,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' MEMORANDUM IN AID OF SENTENCING

In the eighteen-month period between August 2012 and February 2014, Bilal Ahmed ("the defendant"), a dentist entrusted with providing medical treatment to the District's most vulnerable residents and accurately billing for those services, and his co-defendant and office manager at his dental practice Universal Smiles, Mahsa Azimirad ("Azimirad"), orchestrated a prolonged fraud scheme at the expense of a government program intended to aid the poor. In an eighteen-month period, they submitted false and fraudulent bills to D.C. Medicaid in excess of $5.4 million to get rich on the back of a taxpayer funded program intended to benefit low-income and disabled residents of this city. For this conduct, the defendant deserves—and the public trust demands— significant punishment.  Accordingly, the government urges the Court to impose a Guidelines[1] compliant sentence of 71 months, impose a 3-year period of supervised release, order the defendant to pay $5,421,227 in restitution, and enter a forfeiture order of $3,978,879.93 – a sum reflecting the riches he amassed at the expense of taxpayers and D.C. Medicaid's intended beneficiaries.[2]

---

[1]     The United States Sentencing Commission, *Guidelines Manual* (2018) is referred to throughout this Memorandum as the "Sentencing Guidelines," "Guidelines," or "U.S.S.G."

[2]     Consistent with the plea agreement in this case, the United States requests that any sentence imposed run concurrently with the sentence previously imposed in Superior Court Case 2016CF1001292 (to include the conduct described in Count 13 of that case, which had previously been charged separately in Superior Court Case No. 2016CMD012658).

I.      **Relevant Procedural Background**

On January 29, 2019, the United States of America filed a seven-count indictment charging the defendant and Azimirad each with Conspiracy (Count 1), Health Care Fraud (Count 2) and Wire Fraud (Counts 3 through 7), in violation of 18 U.S.C. §§ 371, 1347 and 1343, as well as a forfeiture allegation. On February 4, 2019, the defendant and Azimirad made their initial appearances in the case and were arraigned on the indictment. On September 6, 2019, the defendant entered a guilty plea to one count of Health Care Fraud (Count 2), in violation of 18 U.S.C. § 1347.

The case against Azimirad is set for trial on June 1, 2020.

II.     **Factual Background**

A.  **Chronology of Relevant Events**

The defendant was previously a licensed dentist in the District of Columbia and the sole proprietor of Universal Smiles dental practice ("Universal Smiles"), located at 2311 M Street, N.W., Suite 400, Washington, D.C. Azimirad was hired as the office manager for Universal Smiles.  Azimirad also owned and operated Emerald Consultants, LLC, a company that purported to provide marketing services to Universal Smiles and DES.

On March 9, 2012, the defendant, doing business as Universal Smiles, authorized Azimirad to submit a provider application to the D.C. Department of Health, Medical Assistance Administration, to become a group D.C. Medicaid dental provider.  The defendant became an approved group D.C. Medicaid dental provider effective on June 13, 2012.

On January 15, 2014, the D.C. Department of Health Regulation and Licensing Administration, Board of Dentistry ("D.C. Dentistry Board") issued to the defendant a "Notice of Intent to Take Disciplinary Action."

On February 24, 2014, the D.C. Department of Healthcare Finance ("DHCF") issued a notice of suspension of D.C. Medicaid payments to Universal Smiles.  On June 24, 2014, the D.C. Office of Administrative Hearings upheld the DHCF's decision to suspend D.C. Medicaid payments to Universal Smiles.

On November 3, 2014, after an investigation, the D.C. Dentistry Board substantiated its allegations and entered into a consent order with the defendant suspending the defendant's D.C. dentistry license for no less than one year. See Attachment A. The substantiated allegations in the consent order included complaints from Medicaid and private insurance patients about the defendant. The consent order alleged that the defendant had: (i) submitted false statements to collect fees for which services were not provided or submitted statements to collect fees for services which were not medically necessary; (ii) failed to conform to standards of acceptable conduct and prevailing practice within the dental profession; (iii) failed to cooperate in an investigation or obstructed an investigation ordered by the D.C. Dentistry Board; (iv) failed to maintain accurate and adequate dental records; (v) failed to provide patient records as requested by the patient; (vi) failed to inform a patient of the proposed treatment and any reasonable alternatives in a manner that allows the patient to become involved in treatment decisions; (vii) represented fees being charged for providing care in a false or misleading manner; and (viii) performed unnecessary dental services or procedures.

On January 7, 2015, after his license was suspended, the defendant formed a limited liability company in Maryland called Dental Equipment and Services, LLC ("DES").  DES purportedly engaged in the business of providing business support services required by dental practices, both in their start-up and established phases, in addition to providing office space, equipment, technology, human resources, furnishings, supplies, inventory, and marketing services.

Some of the dentists who came to work for DES after the defendant's dental license was suspended entered into business agreements with DES. These agreements list the "practice site" as 2311 M Street, N.W., Suite 400, Washington, D.C. 20037, the same location as Universal Smiles' office. Azimirad continued to function as the office manager at DES.

B.   **The Scheme and Conspiracy**

The defendant and Azimirad defrauded Medicaid by submitting false claims for provisional crowns that were not provided to beneficiaries.[3]  Azimirad suggested the scheme to use fraudulent provisional crown billing to inflate profits and the defendant agreed to the scheme. The defendant and Azimirad discussed recruiting Medicaid beneficiaries as a way to expand the dental practice's patient pool and billing beneficiaries for provisional crowns as a means to increase the profitability of the dental practice, which in turn would increase their personal income. Azimirad contracted for commercials that prominently advertised Universal Smiles acceptance of Medicaid to be run on a local television station, WDC50, to attract Medicaid patients. The defendant agreed to pay Azimirad a percentage of the practice's monthly income that was generated through the fraudulent billing scheme; and such payments were made to Azimirad's company, Emerald Consultants.

The fraudulent Medicaid billing scheme was executed by the defendant and Azimirad, separately and together, through a variety of means, including but not limited to:

1.  The defendant placing Azimirad in charge of billing and solely in charge of Medicaid billing;

2.  Azimirad having access to all of the dentists' log-in information for Medicaid billing;

3.  Azimirad controlling the billing information that was submitted to Medicaid, even when she was not physically in the office and after the third-party biller was hired;

---

[3] As discussed infra, the fraudulent billing likely extended beyond claims for provisional crowns, but those claims were the focus of the statement of offense in support of the defendant's guilty plea and the basis for the loss calculations.

4. Azimirad monitoring and correcting, and if needed entering herself, the Medicaid billing information after the third-party biller was hired;

5. The defendant annotating beneficiaries' dental records, directly or indirectly through assistants, to add provisional crowns that he did not provide so that Azimirad could justify and submit false claims to Medicaid;

6. The defendant and/or Azimirad annotating beneficiaries' dental records to add provisional crowns that other Universal Smiles and DES dentists did not provide, and about which the other dentists were not aware and did not authorize, so that Azimirad could justify and submit false claims to Medicaid;

7. Azimirad annotating other dentists' routing sheets to add provisional crowns or other procedures that were not performed, so that Azimirad could justify and submit false claims to Medicaid;

8. Azimirad submitting false claims to Medicaid for provisional crowns or other services that were not supported by or that conflicted with the services contained in the beneficiaries' dental records, including for missed or rescheduled appointments and for beneficiaries who had no teeth;

9. Azimirad accessing and controlling the joint bank accounts and post office boxes that she required dentists to open; and

10. The defendant knowingly and willfully ignoring fraudulent entries in beneficiaries' dental records and fraudulent Medicaid billing being conducted by himself and by Azimirad, despite receiving complaints about the fraud from dentists and staff.

In furtherance of their conspiracy and scheme to defraud, the defendant and Azimirad made

false claims to Medicaid for provisional crowns for patients who wore complete sets of dentures

and had no teeth.[4] For example:

1. Between January 13, 2014, and February 24, 2014, they submitted claims to D.C. Medicaid in which they falsely claimed to have provided Medicaid Beneficiary XXXX5582 with 55 provisional crowns, knowing that the dental services had not been provided because the beneficiary had a complete set of dentures and no teeth; and

2. Between July 11, 2013, and February 3, 2014, they submitted claims to D.C.

---

[4] Provisional crowns would not be used for patients with a complete set of dentures because the patients have no teeth to which crowns could be attached.

5

Medicaid in which they falsely claimed to have provided Medicaid
Beneficiary XXXX4124 with 51 provisional crowns, knowing that the
dental services had not been provided because the beneficiary had a
complete set of dentures and no teeth.

In addition, the defendant and Azimirad made false claims to Medicaid for the repeated

delivery of an excessive number of provisional crowns, sometimes hundreds for a single patient.

For example:

1.  Between April 3, 2013, and February 19, 2014, they submitted claims to
    D.C. Medicaid in which they falsely claimed to have provided Medicaid
    Beneficiary XXXX0996 with 524 provisional crowns, knowing that the
    dental services had not been provided; and

2.  Between July 24, 2013, and January 30, 2014, they submitted claims to D.C.
    Medicaid in which they falsely claimed to have provided Medicaid
    Beneficiary XXXX5916 with 295 provisional crowns, knowing that the
    dental services had not been provided.

Further, the defendant and Azimirad made false claims for dental services not supported

by patients' dental records. For example:

1.  They submitted a claim to D.C. Medicaid in which they falsely claimed that
    on February 4, 2014, dental services were provided to Medicaid Beneficiary
    XXXX0890, that is the placement of 13 provisional crowns, knowing that
    the dental services had not been performed because the patient's file reflects
    that the appointment was rescheduled;

2.  They submitted a claim to D.C. Medicaid in which they falsely claimed that
    on April 7, 2015, in the District of Columbia and elsewhere, dental services
    were provided to Medicaid Beneficiary XXXX0373, that is the placement
    of 15 provisional crowns, knowing that the dental services had not been
    performed because the patient's file reflects that the patient received three
    provisional crowns;

3.  They submitted a claim to D.C. Medicaid in which they falsely claimed that
    on May 7, 2015, dental services were provided to Medicaid Beneficiary
    XXXX3370, that is placement of 14 provisional crowns, knowing that the
    dental services had not been performed because the patient's file reflects
    that the patient received dental services on one tooth only; and

4.  They submitted a claim to D.C. Medicaid in which they falsely claimed that
    on or about May 7, 2015, dental services were provided to Medicaid

6

Beneficiary XXXX2012, that is the placement of 6 provisional crowns, knowing that the dental services had not been performed because the patient's file reflects that no new provisional crowns were provided.

Finally, the defendant and Azimirad falsified patient records and billing information. For example:

1. They submitted, a claim to D.C. Medicaid in which they falsely claimed that on February 12, 2014, dental services were provided to Medicaid Beneficiary XXXX7295 on three teeth, knowing that the dental services had not been performed because Dr. DK reported to them that he only worked on one tooth and that the entry in his patient's file reflecting work on the other two teeth was false and not his; and

2. They submitted, a claim to D.C. Medicaid in which they falsely claimed that on November 4, 2015, dental services were provided to Medicaid Beneficiary XXXX2012, that is a limited oral examination and re-cementation of a crown, knowing that the dental services had not been performed because Dr. ST reported only providing the patient with a whitening tray, a non-billable procedure, and the entries on the patient's routing slip concerning the other procedures were not hers.

## III.   Applicable Guidelines Range

The parties have stipulated, and the United States Probation Office has agreed, that after taking into account a three-point downward adjustment based upon the defendant's acceptance of responsibility, the defendant's total offense level under the Guidelines is 23. Based on a criminal history score of six points (Criminal History Category III), that offense level calls for a sentence of 57 to 71 months of incarceration. Under the plea agreement, the parties have agreed that "a sentence within the Estimated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a)."

## IV.   Section 3553 Factors Weigh In Favor of a Guidelines Sentence

"A sentencing judge cannot simply presume that a Guidelines sentence is the correct sentence . . . [T]he correct [approach] . . . is to evaluate how well the applicable Guideline effectuates the purposes of sentencing enumerated in § 3553(a)." *United States v. Pickett*, 475 F.3d

1347, 1353 (D.C. Cir. 2007); *see also United States v. Terrell*, 696 F.3d 1257, 1261-62 (D.C. Cir. 2012); *cf. Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that a within- Guidelines sentence may be presumed reasonable on appeal). Pursuant to 18 U.S.C. § 3553(a), in determining the particular sentence to be imposed, the Court is to consider, *inter alia*:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). "The district court is not required to refer specifically 'to *each* factor listed in § 3553(a),' nor is it required 'to explain sua sponte why it did not find [a particular] factor relevant to its discretionary decision' if 'a defendant has not asserted the import of [that] factor.'" *United States v. Bras*, 483 F.3d 103, 113 (D.C. Cir. 2007) (quoting *United States v. Simpson*, 430 F.3d 1177, 1186-87 (D.C. Cir. 2005)). The Court must impose a sentence sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a).

### A.  Nature and Seriousness of Offense

The defendant's conduct in this case is very serious and warrants the imposition of a sentence that includes a concomitant period of incarceration, as well as orders of restitution and forfeiture.

Dentists play a crucial role in the Medicaid program, as their services are necessary to meet the needs of the beneficiaries. According to the D.C. OIG Medicaid Fraud Control Unit, in 2019, approximately 28% of D.C. residents received Medicaid benefits. Medicaid trusts that the providers who are billing for services are actually providing these services and the defendant (and Azimirad) took advantage of this trust.

To give a sense of a breadth of the fraud scheme in which the defendant and Azimirad engaged, from August 9, 2012, through February 26, 2014, a period of about 18 months, they caused Medicaid to pay Universal Smiles for 26,351 provisional crowns. In contrast, for the same period, the defendant and Azimirad caused Medicaid to pay Universal Smiles for 29,975 procedures using all of the remaining 191 Current Dental Terminology ("CDT") codes.[5]

Of the 284 beneficiaries for whom they billed and Medicaid paid for provisional crowns, the defendant and Azimirad billed and Medicaid paid for several hundred provisional crowns each for several beneficiaries. Further, they billed and Medicaid paid for 102 or more provisional crowns each for approximately 100 of the beneficiaries; for 50 to 97 provisional crowns each for approximately 48 of the beneficiaries; and for 25 to 49 provisional crowns each for approximately 50 of the beneficiaries. See Attachment B for a listing of provisional crown billing by beneficiary.

The defendant and Azimirad enriched themselves at the expense of taxpayers and to the detriment of Medicaid's intended beneficiaries by fraudulently billing Medicaid. Medicaid paid Universal Smiles – which had no Medicaid patients prior to Azimirad's arrival – a total of $12,434,835.10, from August 9, 2012, through February 26, 2014, a period of about 18 months.

---

[5]     CDT codes are a systematic listing of procedures and services performed by providers. Dental providers use CDT codes to describe and evaluate services submitted on Medicaid claims. DC Medicaid uses the codes, in part, to decide whether to issue or deny payment. Each healthcare benefit program established a reimbursement fee for each procedure described by a CDT code. The CDT code for provisional crowns was D2799.

During this same time period, the defendant transferred approximately $8 million in Medicaid payments from Universal Smiles' accounts into his personal bank accounts.

Billing for provisional crowns accounted for $5,421,227 (44 percent) of payments by Medicaid to Universal Smiles. Subtracting out the total amount of income Azimirad, the office manager, was paid through her company, Emerald Consultants, over the course of the entire scheme including DES billing ($1,442,347.13), the defendant enriched himself to the tune of $3,978,879.93 solely from provisional crown billing to Medicaid.[6]

### B.  History and Characteristics of the Defendant

The defendant used his elegant Northwest dental practice as a cover to run a house of horrors in which he not only was bilking a taxpayer-funded program for the District's most vulnerable residents, but also incapacitating and raping patients and sexually assaulting employees and prospective employees. For that conduct, on May 15, 2017, the defendant pled guilty in

---

[6]    It is possible that some provisional crowns billed to Medicaid were actually provided, but likely that the billing for the meaningful majority them still constituted fraud. Medicaid only pays for services which are medically necessary. Based on the consent order issued by the Dentistry Board, it is clear that the defendant provided medically unnecessary provisional crowns for which Medicaid should not have paid him. For example, an expert who reviewed medical records for patient C.G. found that crown restorations performed on six of her teeth were unnecessary. See Attachment A ¶ 17. (Notwithstanding the language of paragraph 17, which repeatedly refers to billing "Medicare," the services described were actually billed to *Medicaid*.) Universal Smiles received $1,875 for five provisional crowns billed to Medicaid for C.G. in December 2012. (The sixth tooth was billed for a resin-based composite on three surfaces, CDT D2393, for an additional $200.) Another example of medically unnecessary crown restoration billed to Medicaid is provided below in the discussion of the defendant's treatment of D.M. Notably, if every patient listed in Attachment B who received 32 or fewer provisional crowns (a full mouth including wisdom teeth, on which dentists do not commonly place crowns) were omitted from the tally of claims and payments, there would still be claims submitted for 24,765 provisional crowns for which the defendant and Azimirad received $5,080,739.50.

Further, the consent order makes clear that the defendant fraudulently billed Medicaid for additional unnecessary procedures that were not included in the $5.4 million figure (which is based solely on provisional crown billing), and for which the defendant should not have been paid. The same expert who reviewed C.G.'s crown restorations concluded that even if they had been necessary, they were billed with unnecessary pulp caps (for which Medicaid paid an additional $330). See Attachment A ¶ 17. Pulp cap billing is an example of the fraudulent billing that was not included in the calculation of the $5.4 million figure.

Superior Court Case 2016CF1001292 to one count of First Degree Sexual Abuse of a Patient with Aggravating Circumstances in violation of 22 D.C. Code §§ 3015(a)(2), (4), 3020(a)(5); four counts of Second Degree Sexual Abuse of a Patient with Aggravating Circumstances in violation of 22 D.C. Code §§ 3016(a)(2), (4), 3020(a)(5); two counts of Misdemeanor Sexual Abuse with Aggravating Circumstances in violation of 22 D.C. Code §§ 3006, 3020(a)(5); and one count of Simple Assault in violation of 22 D.C. Code §§ 3006, 3020(a)(5).

On December 15, 2017, the defendant was sentenced to a total of 16.5 years' incarceration in the Superior Court criminal case. However, the defendant has appealed his sentence on multiple grounds and is awaiting the decision of the D.C. Court of Appeals. See D.C. Court of Appeals Case No. 18CF0026.

Notably, the defendant is so lacking in any moral boundaries that he actually claimed payment from Medicaid for medically unnecessary, aggressive and painful dental procedures he performed upon two of the patients whom he also pled guilty to incapacitating and sexually assaulting, D.M. and C.S., as recounted in paragraph 65 of the Presentence Report.

For example, in an interview with the FBI in February 2016, D.M. explained that he contacted Universal Smiles in April 2013 after being told by a different dentist that he had an impacted wisdom tooth that needed to be removed. After the office verified that he was covered by Medicaid, he came in for an appointment with the defendant.

According to D.M., the defendant insisted on taking new x-rays (even though D.M. had very recent x-rays with him), and told D.M. that his wisdom tooth was not impacted, but that he had a rotten tooth that needed to be pulled. D.M. stated that the defendant put him on excessive "anesthesia," and told him that all the teeth in the lower left portion of his mouth were bad and would need to be replaced. D.M. said the defendant drilled the teeth on the lower left side of his

mouth "to nubs and put epoxy crowns on top of them." According to D.M., the defendant also stated he would drill the entire lower right side, but D.M. objected due to the extreme discomfort. D.M. left pained and upset.

According to D.M., when he came back a few days later for reconstruction of the teeth that had been drilled, the defendant told him that the temporary crowns which were applied in the previous visit were put in incorrectly. According to D.M., the defendant again administered excessive "anesthesia," and drilled the lower right side of his mouth and top left portion of his mouth, claiming that it was an insurance requirement to prep the entire mouth before reconstruction.

D.M. told agents he later filed a civil action against the defendant which settled out of court. In connection with that proceeding, his attorney referred him to another dentist who examined him, treated him for gum disease, and informed him that the drilling the defendant performed had been unnecessary, and that extraction and implants were needed to correct the work the defendant had done.[7]

In a 2017 victim impact statement by D.M. filed in the Superior Court sexual assault case (which is simultaneously being shared with the Court and counsel but not publicly filed), D.M. detailed, *inter alia*, the lasting impact the defendant's sadistic dental malpractice has had on him. He described the "severe pain" he experienced from "the damage [the defendant] did to [his] mouth." He stated, "It has affected me from an emotional standpoint in that I won't get my teeth

---

[7]     D.C. Superior Court records show D.M.'s civil lawsuit was filed on April 22, 2014. In the complaint, D.M. alleged dental negligence, lack of informed consent, assault, sexual battery, and intentional and negligent infliction of emotional distress. The dental malpractice claim included allegations that on April 23, 2013, while D.M. was under the effects of nitrous oxide sedation, the defendant, without permission, consent or authorization, began to work on D.M.'s teeth (other than the wisdom tooth for which D.M. originally sought treatment) and prepared many of the teeth for crowns, even though it was clear that many of the teeth would have been properly treated with excavation of decay and a filling, *i.e.,* the crowns were medically unnecessary. The lawsuit was dismissed with prejudice pursuant to a settlement on November 5, 2014.

fixed" even though "19 of my teeth are ground down to stubs." He described leaving the waiting room of other dentist's offices on six occasions because he could not endure the thought of having corrective procedures performed to repair the numerous teeth the defendant had drilled down without medical justification.

Medicaid billing records show that the defendant billed Medicaid $25,898 for the unnecessary and painful butchering inflicted on D.M. in two dates in April 2013, all so that he and Azimirad could make a fortune. The defendant's claims for services provided April 25, 2013, included a new set of x-rays ($70), and provisional crowns on eight teeth ($1,600) – four on the upper right side of D.M.'s mouth (teeth 1, 2, 5 and 4) and four on the lower right side of D.M.'s mouth (teeth 28, 29, 30, and 31). The defendant's claim for services provided on April 29, 2013, included provisional crowns on eighteen teeth ($3,600) – to include repeat billing of the eight teeth billed just four days prior, as well as five teeth on the upper left side and five teeth on the lower left side.

To the extent the defendant deserves credit for his acceptance of responsibility in this case, he has already received it in the form a plea offer to less than the full indictment,[8] a three-point reduction in his offense level based on his early acceptance, and the government's agreement to limit its allocution to concurrent time with his Superior Court criminal case, in which he is appealing his sentence.

### C.  Deterrence

As the Sixth and Eleventh Circuits have found, because white collar crimes "are more rational, cool and calculated…these crimes are prime candidates for general deterrence." United States v. Musgrave, 761 F.3d 602, 609 (6th Cir. 2014), citing United States v. Martin, 455 F.3d

---

[8]      Had the defendant been required to plead guilty to Counts 3 through 7 of the indictment, wire fraud in violation of 18 U.S.C. § 1343, his base offense level under the Guidelines would have been 7 instead of 6.

1227, 1240 (11th Cir. 2006). Health care fraud has been, and continues to be, a substantial problem both nationwide and in the District. Those who participate in this sort of white collar crime undoubtedly monitor the cases of others charged with similar crimes and weigh the costs of a potential prison sentence against the benefits of their potential ill-gotten gains. Thus, sentences that include a meaningful period of incarceration, do serve a legitimate deterrent purpose.

The Health Care Fraud Strike Force began operations in 2009, with two of its main Strike Forces in Detroit and Miami. Approximately 1,000 individuals have been indicted in these Districts in connection with a number of Medicare fraud schemes. The deterrence effort has paid off. Between 2010 and 2017, costs in the Eastern District of Michigan and Southern District of Florida for Medicare Part A, which covers home health care, and Part B, which covers physicians' services, have decreased by approximately 9%, resulting in a total savings of almost $1 billion in each district, which is twice as much in savings than in any other district. In short, there can be no doubt that these targeted prosecutions have deterred others from defrauding the Medicare program and protected the public.

All of the money involved in this scheme came from the Medicaid program. Such fraud has real and tangible consequences: every dollar stolen from Medicaid is a dollar that could have been used to provide valuable services to Medicaid beneficiaries, who are often the most physically and financially vulnerable members of our society. Accordingly, the United States respectfully requests that the defendant's punishment reflect the need to promote respect for the laws that protect the public and guard against health care fraud.

## V.      CONCLUSION

For the reasons set forth above, the United States requests this Court to (1) impose a sentence within the applicable Guidelines range of 57 to 71 months, concurrent to the sentence previously imposed in Superior Court Case 2016CF1001292; (2) impose a term of supervised release of 3 years; (3) order the defendant to pay restitution in the amount of $5,421,227; and (4) enter a forfeiture money judgment in the amount of $3,978,879.93. Such a sentence reflects the seriousness of the offense and provides an effective specific and general deterrence.

Respectfully submitted,

JESSIE K. LIU
United States Attorney

*/s/ Emily A. Miller*

By:    _____

EMILY A. MILLER
D.C. Bar No. 462077
Assistant United States Attorney
Fraud & Public Corruption Section
555 4th Street, N.W., 5th Floor
Washington, D.C. 20530
(202) 252-6988
Emily.Miller2@usdoj.gov